session. Good morning, ladies and gentlemen. We have six cases on our calendar this morning. Contract case from the Board of Contract Appeals, anti-dumping case from the Court of International Trade, patent case from a district court, two veterans cases, and an employee case. The employee case and one of the veterans cases are being submitted on the briefs and will not be argued. First case to be argued is, not the first one I have listed, Arctic Slope v. HHS, 2010-1013. Mr. Miller. Good morning, Your Honor. May it please the Court. In fiscal year 1999, the Arctic Slope Native Association fully performed a contract with the federal government to operate the government's hospital in Barrow, Alaska. And the Secretary would later record that the Secretary had underpaid Arctic Slope by just shy of $2 million. In the Cherokee Nation case, the Supreme Court held the government liable in money damages for paying another government contractor, for underpaying another government contractor. The question is different in that there is not to exceed language in the appropriations. Precisely. The question before the Court is whether the two appropriations... You better not talk over me. Pardon me, Your Honor. So why doesn't the fact that there's not to exceed language in there change the result? Because in either event, Your Honor, the appropriation on its face is more than sufficient to pay the contractor, and that is the rule of Ferris. If an appropriation on its face is sufficient to pay the contractor, then the contractor is entitled to rely on that fact and proceed with its work. But there was no contractual limitation in Ferris, right? There was no contractual... Well, there was. Certainly, there was a contractual... There was a limitation on the ability of the United States to pay funds. But that wasn't in the contract. There was no subject to availability of appropriations language in Ferris, right? I appreciate Your Honor's question. There is an availability of appropriations clause in this contract, in this statute, in fact. But the Supreme Court said at page 643 of its opinion that the availability of appropriations clause doesn't change the Ferris rule. It operates for a different purpose. The availability of appropriations clause, at least a normal availability clause, the Supreme Court tells us, is designed to permit a contract to be awarded before the appropriation is enacted, and it doesn't go into effect. The words are, unless and until the appropriation is enacted. That's the purpose of the availability clause, and the Supreme Court goes on then to cite Ferris, and to reiterate that the Ferris rule still controls the outcome of the case, so long as the appropriation is sufficient on its face to pay the contractor. What's interesting about that passage when the court talks about the availability clause is that in the next paragraph, which is I think 643, 644, in that neighborhood, the when there's an availability clause, that gives the secretary discretion to deal with an insufficient appropriation, and the court goes on directly to reaffirm the Ferris rule that regardless of the insufficiency of the appropriation to manage all of the secretary's contracts, there is no secretarial discretion, and the contractor is entitled to be paid in full. So doesn't the last section of the Supreme Court's opinion in subsection C assume that if there had been not to exceed language that that would have been the end of the matter because they're trying to determine whether there was a retroactive limitation on the appropriation? I don't think so, Your Honor. There was quite a lot of discussion in the Supreme Court's majority opinion about Blackhawk, and Blackhawk focuses a lot on reprogramming. In this court's opinion, Your Honor's opinion in the Thompson case talked a lot about reprogramming, and the issue really was joined on that issue on that point in the proceedings below. The question before the court, I think, when it discussed section 314 in the last opinion was whether that was trumped by the subsequent appropriations rider that tries to incorporate report language. Yeah, but isn't the assumption of subsection C that if the thing had been retroactive and retroactivity had been permissible that that would have been in favor of the government or the government would have won? I don't think so, Your Honor. And the reason I say that, it would be impossible to square that interpretation with what the court said about the Ferris rule. But except their discussion about Ferris is in the context of a situation where the agency can reprogram, not in the context of a situation in which it can't because there's a not to exceed language. Well, I would disagree on that point by looking at Ferris itself. Ferris itself involved a line item appropriation for improvement of the Delaware River. It was an earmark. It was about as narrow an earmark as you can get short of an earmark that says only so much funds for this project. Sutton kind of situation. In Ferris, there was an earmark for the Delaware River. Ferris did a piece of the work below Philadelphia. No doubt there were other contractors elsewhere on the river doing other work. And the fact that no other funds, of course, could be reprogrammed because there's basic law that if there's an earmark, you can't take funds from elsewhere in the appropriation to supplement the earmark. Even though no other funds could be reprogrammed, Ferris prevailed. In fact, Ferris prevailed even though the government told them to stop working. Well, I understand that. But what distinguishes Ferris is the absence of contractual language about not to exceed. The government's argument here is where you couple the availability of appropriations language in the contract together with the not to exceed provision in the appropriations bill, that that distinguishes Ferris. It distinguishes Cherokee. And isn't that true? It's a distinction without a difference. It is a distinction. It can't be the rule because that's not a workable rule in government contract. If that were the rule, how does the contractor know what the contractor is going to be paid? How did Arctic Slope know what it would be paid? I mean, Arctic Slope had no idea what it would be paid. And in fact, it continued to get payments a few days after the fiscal year was over. And still, that wasn't the full amount. We want to ask, what did Arctic Slope think it was going to get paid? They had this old Q system, which your honor is familiar from the first case. And the Q system had Arctic Slope on the top of the Q. I'm sorry. Go ahead. If one speculates, if one goes away from a workable rule that's based on objective criteria, is an objective criterion, is the appropriation sufficient to pay the contractor? We've got a workable rule. If we instead say, no, the rule is going to be that the secretary in this situation has a discretion to allocate the fund in whatever way the secretary deems best, which they claim is unreviewable discretion, A, it's an unworkable rule, and B, it really countermands the Indian Self-Determination Act, which represented a tide of effort by the Congress to eliminate all possible secretarial discretion over funding matters. It would be the most peculiar result to decide that the secretary has unfettered discretion over funding matters when there's one penny less than the full amount. And that is not the law under Ferris, and I don't think the court's opinion supports that. Your honor had a question. Yes. You wouldn't disagree, would you, that Congress could create a regime in which that exact scenario would apply? In other words, Congress could say that we'll tell you how much is appropriated, and then even though you've signed your contracts earlier, the amount that you will be paid will be subject to whatever we actually come up with with an appropriation. Absolutely. I think there is no impediment to Congress trumping a common law rule, a Ferris rule of government contract law, and stepping in and saying something otherwise. Congress could do it by amending the Authorizing Act. Congress could do it in the Appropriations Act. But it needs to do it very clearly because we're talking about a law that's been out there for 130 years on the rules regarding government contracting, and we want government contractors to know because the outcome here is going to be as binding for these tribal contractors as it's going to be for other government contractors subject to availability of appropriations conditions. How are they supposed to do it? Pardon me, your honor? The not-to-exceed language, according to the Red Book and according to our opinion in Thompson, is the traditional language that limits the use of the appropriation. So what language should they have used if not-to-exceed didn't do it? Oh, I misspoke if I said not-to-exceed didn't accomplish that result. I mean, certainly the agent can't spend more money than the agent gets from Congress. The agent's stuck. If the agent has over-obligated the appropriation, that's the agent's problem. The question is if Congress wants to prevent the money from being collected not only at the front end from the agent over-committing but also at the back end from the judgment fund, Congress could do that. Just to clarify your response to my question. Congress can do both things. Secondly, Congress can cut off the judgment fund. Secondly, or the first question, your honor, Congress can say out of the not-to-exceed appropriation, every contractor is going to receive 80% of what it's received in the preceding year, and that's a certain knowable amount, objectively verifiable from the face of the statute. But what contract law cannot tolerate is a situation where the contractor proceeds, fully performs the contract, and even after the contractor has performed, still has no idea what the contract amount is payable by the government is going to be because the government is saying we'll decide, we'll let you know. In fact, we're starting out with zero, and we'll tell you when we find the money, wherever we find it, we'll tell you how much. That's not a contract. That's a grant. And the peculiar thing about that is that the Court of Claims used to say that these contracts were really grants, and even though they were called contracts in the early 80s, the court ruled in the Busbee decision that they could not be enforced under the Contract Disputes Act because there wasn't certainty, because the secretary could adjust the funding level at whatever level the secretary chose. And the Senate report in 1987 shows that Congress deliberately intended to trump that rule, as well as the practice of the secretary not funding the contracts, not awarding the contracts. We end up in 88 with a statute that says the secretary must award the contract. The secretary can't hold the contract hostage to a funding level. The secretary must put the full amount. Do you want to finish your question? No, no, I'm fine. The secretary has to put the full amount in the contract. The secretary has got to provide remedies in the event of a breach. The secretary has to report midterm. And this is something maybe worth pausing on. In the current year, the secretary is supposed to tell Congress, I'm running short. Why? Why is there that reporting requirement, 450J-1C, so that we can have a supplemental appropriation? That's what happens in DOD contracting. You have a supplemental appropriation if the secretary thinks he's running short. Did the secretary make a report in the current year? No. The secretary tells us he made a report three months after the year was over, long after Congress could do anything about it. So we have a congressional scheme designed to take away all discretion from the secretary in funding matters, and then we're going to end up with an outcome that says if it's one penny less than the full amount, the secretary can do anything it wants. It can abandon all prior procedures. It can overpay some contractors, fully pay some, pay some 50%, pay, like Arctic Slope, pay some 30%. I mean, that's madness. And it would make no sense for a government contractor to enter into a contract with the United States under those circumstances. At least it's going to make it a lot more expensive for the government, because I'm going to have to insure against the possibility that the secretary will zero me out. And yet I have to go forward and perform the contract. How can I perform the contract? And to me it's instructive to see that. Why doesn't the contract provide notice by saying it's subject to the availability of appropriations? That's a normal availability clause. It's a plain, vanilla availability clause. The Supreme Court cited three of, I think, 50 statutes we cited to the court in that case that provide for such a clause. Why? Because it was important for the court, excuse me, important for Congress, to make clear that it was not giving the secretary contract authority to commit the United States without regard to an appropriation. As Your Honor is aware, under the Anti-Deficiency Act, Congress has the power to authorize a contract that operates without regard to appropriations. New York Airways was one of those examples. And in Oglala-Babbitt decision, that was the argument being made by the proponents there, that they had contract authority and the availability clause didn't matter. And Your Honor said, no, it does matter. It does matter. This is not a contract that operates without regard to available appropriations. The Supreme Court agreed. It said it cited New York Airways. Miller, you wanted to save a little rebuttal time. Do you still want to do that? Thank you so much, Your Honor. Thank you so much, Your Honor. All right. Mr. Shunk. Thank you, Your Honor. May it please the court, two quick responsive points. First, Ferris does not apply in this case. In Ferris, the agency agreed to a contractual obligation and did not fulfill the obligation due to a lack of appropriations. Here, Congress allocated a certain amount of money to the agency for a specific task. The agency used all of that money to do that task, assuring this contractor that if appropriations were available, it would receive a certain quanta. This contractor received that quanta. There's no breach here. In Ferris, the agency assured a contractor if something would happen that didn't occur. Here, that's simply not the case. The agency assured this contractor that subject to conditions, it would receive a certain amount and it received that certain amount. Ferris simply does not apply. That sounds like an argument you could have made in the first case. Don't you have to rely on the not to exceed language? The first case being the first Cherokee case before this court, Your Honor? Yes. Well, there's actually a breach in that case. That is that the agency in that case assured more than what was provided. But don't you have to rely on the not to exceed language? You didn't mention that in your argument. The argument you were making sounds as though it would apply to the Cherokee case just as to this one. In the Cherokee case as well, there was an actual amount in the contract that wasn't provided. Certainly here, the board assumed there was a duty beyond the amount, which is why the not to exceed language is controlling here, which is what the board's opinion relied upon. It's also why Ferris does not apply. Secondly, the cites to the general purposes of the ISDA were the exact same arguments made before this court in Ogallala, which this court expressly rejected based upon the clear and unambiguous language in the appropriation, which is the case here. Affirmance of the board's opinion... Do you think the rationale in Ogallala survives Cherokee? Or do you think that there is another possible rationale for the result in Ogallala that survives Cherokee? I wasn't clear about what the government's position was on that. Ogallala is a binding panel decision that's continuing to bind this court's decision. It continues to bind us only if it isn't overridden by Cherokee. Yes, Your Honor. So my question is, is it? And if it is with respect to its rationale, is it not overridden with respect to its result? It is not overridden, Your Honor. With respect to either? With respect to either, Your Honor. You don't think the rationale of Ogallala, this court's decision in Ogallala is inconsistent with Cherokee? No, Your Honor. All right, and why? Well, this court's decision in Cherokee... No, no, the Supreme Court's decision in Cherokee is what I'm talking about. Certainly, which affirmed this court's decision in Cherokee. Well, yes, but on a different ground. So I would like you to address specifically, in what respect do you think Ogallala's rationale survives the analysis in Cherokee? Page 1378 of Ogallala states that if there's a statutory restriction, the agency is not free to increase funding beyond that, and that survives Cherokee because there is a statutory restriction here, which is indicated by this court's decision in Cherokee. A statutory restriction in Ogallala being what? The same restriction that's at issue here, Your Honor. It wasn't a not to exceed, right? It was subject to... Well, but that wasn't the rationale of the court, right? In Ogallala, it was not predicated on the not to exceed, if I recall the case correctly. The majority of the holding focused on the subject to appropriation. Right, yeah, I mean, that was the rationale of Ogallala, and that does not survive Cherokee, I take it. The Supreme Court gave a perhaps slightly different interpretation of that language that doesn't override the holding. They said no instead of yes. That's not quite correct, Your Honor. All right, how is it not correct? In what respect is that not a correct characterization of what the Supreme Court did to that rationale? The Supreme Court recognized that the subject to appropriation language indicated that the contracting officer doesn't have unilateral authority to obligate public funds. An appropriation with the appropriations clause and other statutes, that there must be an appropriation before the contract becomes valid, which is the same argument here. The not to exceed language in Ogallala is also here, and it's also binding here, and the court's finding that that language, that statutory restriction applies as enforceable, does outlast Cherokee because it's not overridden by Cherokee. And in fact, the Supreme Court's decision in Cherokee indicated that had the congressional reports in Cherokee, which contain language similar to not to exceed but not even as forceful as not to exceed, had those congressional reports been enacted into law as opposed to remaining in committees, that language would have been effective. In other words, it's the combination of the not to exceed language and the availability language. In Cherokee, the availability language didn't get the government anywhere because there was no limit in the appropriation. The appropriation was subject to reprogramming, whereas here, it is subject to the not to exceed language and can't be reprogrammed. Yes, Your Honor. The not to exceed language here is the ground relied upon by the court. But it's the combination of the two, right? It's the combination of the availability of appropriations, which in Cherokee was found not to be limiting because there were available appropriations because of the ability to reprogram. That's true, Your Honor. Here, however, again, the contract specified a quantum and the agency provided that quantum. So even if there weren't the subject of the availability charge, it's hard to see a breach of contract in this case. Well, I find that argument to be completely inconsistent with the Cherokee case. You have to rely on the not to exceed language to distinguish the Cherokee case. And the board here relied upon the not to exceed language, Your Honor. Exactly. And it does, in fact, control here. And the firmness of the board's decision then rests upon these two propositions. The first of which is that Congress intended this result here. And the second is that any other result would lead to conclusions, that is, illogical, unlawful, and, in fact, unconstitutional. The first is that, make no mistake, Congress did intend this result. It used the not to exceed language that the GAO recognizes as being the most effective language Congress can use to limit an appropriation. The argument here isn't really there's a breach of contract. This is guised as a breach of contract action. The argument here is a lawsuit against Congress, wishing that Congress were to appropriate more money. But that didn't happen. This is not rightfully a breach of contract action against the agency. And that is the intent of Congress. And, again, Ogallala enforced this language. And this court, after Ogallala, enforced this language. Highland Falls, Greenlee, which was after Ogallala, and Cherokee, and Starborough. The whole question is intent of Congress, isn't it, really? I mean, each of these cases, it seems to me, comes down to asking the question of whether Congress intended, A, to authorize the contracting officers to commit federal funds at the front end. And, B, if so, or if there was a limit on the funds that could be authorized in the front end, did Congress intend to make the judgment fund available in the event of an excess beyond what the contract officer was authorized to pay? And the answer could be either yes or no to either of those questions, right? And depending on congressional intent. I mean, you could have a case. You certainly would admit, I'm sure, that in which the contracting officer went beyond what he was designated to do by way of committing funds. But nonetheless, the judgment fund is liable for the contract breach. Certainly not. Right. So the question is entirely one of congressional intent, right? And what the agency was authorized and actually did. I mean, it's not only what Congress intended in the limit. Well, but they're authorized by Congress. So we're asking, ultimately, the question of what Congress intended, how Congress intended the scheme to operate. A, what they were authorizing, and B, what they were making available by way of remedy to a complaining party who felt that the scheme was not properly employed by the agency. I mean, there isn't any residue of constitutional or extra-congressional remedy here, right? It's just whatever Congress has decided to erect. That's right, Your Honor. In conjunction with what was promised to the contractor. Yes, Your Honor. It is congressional intent. And speaking to the judgment fund, judgment fund can't be used here to pay whatever damages there purportedly are for breach of contract. The judgment fund, section 1341, provides that the judgment fund exists when other funding is not otherwise provided for. Here, Congress provided for other funding. I don't know why you keep making that. It's the same kind of argument that you made in Cherokee that got rejected. I don't understand why you keep repeating arguments that are no longer tenable. That's just wrong. The cap indicates, Your Honor, respectfully, that other funds here are provided for CSC costs, which is dimmer than Cherokee. Congress indicated for those funds. It's the not to exceed language. It's not that they appropriated a certain amount of money for this. It's that the not to exceed language bars reprogramming. No? In initial programming, Your Honor, certainly. But certainly, that doesn't mean that the judgment fund somehow exists as some buffer. Because the not to exceed language is there. As well, any ruling here, again, it would be logical because it forces the agency somehow to enter into a contract that it must, without a doubt, breach, which cannot be the result intended by Congress. And along with the judgment fund statute, a ruling in the contractor's favor here would violate no fewer than three other statutes. The Anti-Deficiency Act, Section 1532, which provides that an agency cannot use their authorized funds obligated for one source specifically for another source, and Section 450J-1C, which requires that the secretary will not be required to take from one contractor to give another. A ruling here in favor of the tribe would contravene all of those statutes, as well as their appropriations clause. Accordingly, if there are no further questions from the court, why would a ruling in favor of the contracting party here violate the Anti-Deficiency Act? I thought the Anti-Deficiency Act was directed at the government contracting officer, not at whatever remedy might be available to the private party through a lawsuit that would reach the judgment fund. Thank you, Your Honor. Because, Your Honor, a ruling here in this contract would require the contracting officer to guarantee every tribe full entitlement to CSC when there were no funds to pay. The Anti-Deficiency Act restricts contracting officers from obligating funds that it doesn't possess. A ruling here, however, would force the contracting officer to obligate funds that it undoubtedly does not have, which would violate the Anti-Deficiency Act. Thank you. Thank you, Mr. Shunk. Mr. Miller has a little rebuttal time, two and a half minutes. Thank you, Your Honor. Judge Dyke, Judge Dyke's question is absolutely on target. Does the not to exceed language make a difference? And I can see that it does make a difference. Not to exceed $200 million is available to pay this contract. That's what the statute says. Not to exceed $200 million is available for contracts of poor cost payments. In the Cherokee decision, it was not to exceed, I think, $1.5 billion or thereabouts was available to carry out the Indian self-determination and other purposes. That language was not in Cherokee, right? The not to exceed language? Correct. So it was subject to appropriations in Cherokee, not to exceed. They're both subject to appropriations. The appropriation at issue in Cherokee, which was also limited by time, purpose, and amount like any appropriation, was $1.5 billion. The appropriation here is a $200 million appropriation, still limited by time, purpose. But there's another difference. In each case, it's subject to the availability of appropriations. In Cherokee, the Supreme Court said, subject to the availability of appropriations doesn't prevent you from reprogramming other funds to pay for it. And now what the government is saying is that we, again, have the subject to availability of appropriations. But unlike Cherokee, the appropriations are not available because the not to exceed language prevents reprogramming. And you must agree, don't you, that the not to exceed language prevents reprogramming? It prevents reprogramming outside the contract support funds. I mean, this isn't a single line item for a contract. But it doesn't prevent reprogramming within the fund. It doesn't prevent reprogramming from among the payments the $200 million is available to three or 400 contractors. It doesn't prevent reprogramming at all in that respect. But the problem is there's not enough money in the appropriated funds not to exceed to satisfy all the obligations. And that's always the situation in a fair situation. There aren't enough funds. Your Honor, on page 641 of the court's opinion, there's discussion about what do we do if, in paying this contract, we'd have to reduce funds owed to other tribes? And then the government had conceded, well, it's not just a question of reducing. What if we've obligated the funds? And the government says in its own brief, followed by the court's citation to Ferris, if the amount of an unrestricted appropriation, and this one was not restricted in terms of paying Artic Slope, if the amount of an unrestricted appropriation is sufficient to fund the contract, the contract is entitled to payment even if the agency assumes other obligations that exhaust the funds. So even if the agency has assumed other obligations to 399 other contractors that exhaust the funds, if that not to exceed $200 million was sufficient, and that was a boatload of money, Your Honor, that was a $35 million increase from the prior year. So in your view, the only way that Congress could accomplish this would be in the appropriations bill to actually allocate the money as to each one of these Indian health programs. Wouldn't have to be that specific. Why not? There were many options. I would say that Congress could do that. If they did that, if they did a line item for each thing, that would be the end of it, right? It would be the end of it. Or if Congress, sometimes we see this, Congress appropriates by reference to a document that's in a committee report. We've seen Congress do that. Congress could have done that, incorporated by reference to a document in a committee report. Congress could have said, every contractor gets 80% of the contract support cost price. Congress could have done that. It'd be a knowable amount. Congress could have said, as Judge Bryson suggested, the judgment fund's not available if this gets short. There's another question? No, no. Actually, I'm fine. Thank you. Thank you, Mr. Miller. Your time has expired. Thank you so much, Your Honor. Thank you for letting me go over. Thank you. Mr. Sanchez versus the United States et al, 2010-1024. Ms. Sanchez.